**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

August 22, 2025

<u>**VIA ECF**</u>
Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     <u>**United States v. Erik Lopez Valdez**</u>
        **24 Cr. 458 (RA)**

Dear Judge Abrams:

Erik Lopez Valdez—a 39-year-old father of two, with no prior criminal history or history of violence—comes before this Court for sentencing for acting as a one-time drug courier. As set forth below, his deeply misguided criminal conduct was motivated by a desire to fit in. Mr. Lopez Valdez came to the United States from Spain in 2023 knowing one person, his cousin Luis Jimenez, who he moved in with in Camden, New Jersey. After several months of not meeting anyone or making new friends, Mr. Lopez Valdez found a community at a bodega in Washington Heights popular with people from his hometown in the Dominican Republic. He enjoyed making friends, shooting pool, and playing dominoes there so much that he would drive the two hours from Camden to Manhattan just to spend time there. So when two men he knew from the bodega asked him to pick up a package in Camden and bring it to Manhattan, he said yes. He wanted to help out his new friends. That terrible decision, which has resulted in his first and only conviction, will send him to prison and permanently remove him from this country, a more than sufficient punishment for his conduct.

Mr. Lopez Valdez feels deep shame and remorse for his actions. *See* **Exhibit A** (Letter of Erik Lopez Valdez). Though originally unfamiliar with opiates and the suffering they have caused in the United States, he now realizes how dangerous fentanyl and related drugs are. Now that he knows, he is sorry for helping to distribute such a dangerous drug. He is the first person in his family to ever be

arrested or convicted of a crime and worries what the permanent mark of a felony conviction will do to his own and his family's reputation.

Mr. Lopez Valdez's conduct since his presentment is a testament to his remorse. Prior to his remand at his plea hearing, he spent ten months at liberty, complying with pretrial supervision, including during a long period of home incarceration. Due to his lack of criminal history, his lack of any organizational or leadership role in drug trafficking, and the lack of any weapon or violence in connection with the offense, Mr. Lopez Valdez was eligible for the so-called "safety valve." *See* 18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. § 5C1.2(a). But out of fear of retribution, Mr. Lopez Valdez did not take advantage of that opportunity. He now comes before this Court having pled guilty to 21 U.S.C. § 841(b)(1)(B).

Mr. Lopez Valdez is subject to a five-year mandatory minimum and will be deported after release. The parties agree that his recommended sentencing range is 60-71 months. Given his minimal role in this nonviolent offense, his lack of criminal history, and the immigration consequences he faces, I respectfully ask the Court to sentence Mr. Lopez Valdez to the five-year mandatory minimum.

## FACTUAL BACKGROUND

Mr. Lopez Valdez, age 39, was born in Azua de Compostela, Dominican Republic, the oldest of three born to Francisco Alberto Lopez Medina and Santa Yuderka Valdez Ramirez. His sister Yamirla Pamela Lopez Valdez is three years younger than him, and his other sister Lissa Belen Lopez Valdez is 11 years younger.

Mr. Lopez Valdez spent his childhood in the Dominican Republic. His mother left for Madrid, Spain to find work when he was five, so Mr. Lopez Valdez and his sisters spent much of their childhood living with their grandparents Severina Ramirez Silva and Jesus Valdez. Severina and Jesus were loving. They always had food on the table when the kids got back from school and would take them out for ice cream. The family went to the beach every Sunday and to the park during the week. When not spending time with his grandparents, Mr. Lopez Valdez played with his sisters and the many kids in his neighborhood. Baseball and basketball were his favorite sports, and he also liked to ride his bike. Like all kids, Mr. Lopez Valdez sometimes got in trouble, but his grandparents never hit or yelled at him when he did. They would just explain to him how to improve his behavior going forward.

Mr. Lopez Valdez's grandparents were retired, so they relied on the money his mother Santa would send back from Spain. Santa made a steady income as a home

health care worker for the elderly. The money she sent was not enough to buy a car, but it was always enough to cover food and clothes for the family, and medications for Mr. Lopez Valdez's grandparents. In addition to the money, Santa stayed in touch with her kids, calling them once a week and coming back to visit every year for a month.

When he was 17, Mr. Lopez Valdez and his sisters moved to Madrid to be with their mother. Mr. Lopez Valdez did not want to go to Spain at first. He was comfortable in the DR, where he had lived his whole life, and where he had friends and a girlfriend he did not want to leave behind. But he adapted to life in Madrid, settling into a routine of going to school and, later, working at McDonald's. When it became too much to balance both school and work, he quit school and started working at McDonald's full time. He worked his way up to manager. He oversaw incoming food shipments, unpacked the new food, and supervised a team of employees when the general manager put him in charge of the kitchen. He used the money he earned to help his mom with the bills.

Mr. Lopez Valdez quickly became independent. He started dating Carla Daniela Perez Martes, whom he met in Madrid through mutual friends. They had their first child, ███████, when Mr. Lopez Valdez was 21. Mr. Lopez Valdez's McDonald's salary and Ms. Perez Martes's waitressing salary meant there was enough money for Mr. Lopez Valdez to move out of his mother's house and into an apartment with his new family. Also around this time, Mr. Lopez Valdez used the business acumen he gained at McDonald's to strike out on his own, opening a remittance business at age 23. Ms. Perez Martes had recently given birth to their second child, a daughter the couple named ███████, so the salary increase from the new job meant the family could move into a bigger apartment. They lived near Mr. Lopez Valdez's mom and sisters, who were eager to look after the kids when Mr. Lopez Valdez and Ms. Perez Martes were busy.

Then things went south. Ms. Perez Martes moved to London in search of better paying work. The couple separated, and Mr. Lopez Valdez could not afford their apartment on his own, so he moved into his mother's house with the kids. His business suffered financially and eventually he had to close it. This frustrated Mr. Lopez Valdez, and the move back in with his mother made him feel like he was regressing. But he found a way to make do. He got a job with a friend in remittances and took a part-time job driving doctors to see their geriatric patients. His new work schedule allowed him to spend more time with his kids. He would take them to the park where they liked to ride their bikes and play soccer. He also enjoyed sitting with them while they colored and watching them help his mother bake cakes. After

stabilizing himself financially, Mr. Lopez Valdez decided to give running his own remittance business another shot. But he was unable to get it off the ground and closed it in 2023.

As his business faltered, his children went to live with their mother in London. Mr. Lopez Valdez stayed in touch with them, speaking on the phone every few weeks, and, once they became old enough to have their own phones, trading WhatsApp messages with them at least once a week. The kids also stayed close with his mother Santa, calling her to ask for new cooking recipes and describe how excited they were to visit her and Mr. Lopez Valdez in Spain. Mr. Lopez Valdez remembers these visits fondly, feeling love from and connection with both his kids and mother. The children still visit Spain to see their grandmother once a year.

After years of struggling financially in Spain, Mr. Lopez Valdez came to the United States in search of steady employment. He arrived in February 2023 under the United States' visa waiver program for nationals of certain countries (known as "ESTA"), which authorized him to remain in the United States for 90 days.[1] He moved into his cousin Luis Jimenez's house in Camden, New Jersey, where Luis lived with his wife and three kids. While living with Luis he took Luis's kids, Mr. Lopez Valdez's nephews, to school every morning and watched them when Luis and his wife went out. **Exhibit E** (Letter of Luis Jimenez). But he did not need to live there for long: Mr. Lopez Valdez found the work he came to the U.S. for just two weeks after getting here, which soon gave him enough money to rent an apartment in Camden. He worked as a delivery driver, first for Amazon and then as a contractor for GOMO, an Uber-like app for businesses to schedule delivery drivers.

About a month after arriving in the U.S., Mr. Lopez Valdez went sight-seeing in New York City. He heard about Elsa's Chicharrones, a Dominican restaurant in Washington Heights where people from his hometown ate, so he decided to check it out. After eating, he stopped by the bodega a few doors down from Elsa's, where he had heard people from his hometown also gathered. The group at the bodega welcomed him, including Mr. Lopez Valdez in conversations about home, baseball, and soccer. Mr. Lopez Valdez enjoyed shooting pool and playing dominoes with them. He decided to start hanging out there whenever he had time. Every few weeks, he drove the nearly two hours from his place in Camden to the bodega just to spend time with his new friends. Other than his cousin Luis, the guys at the bodega were the

---

[1] Because Mr. Lopez Valdez has overstayed, he is subject to deportation proceedings after his term of imprisonment. *See* PSR ¶ 52.

only people Mr. Lopez Valdez knew in the U.S. When he was not there, he was working and largely alone.

After about a year of spending time at the bodega, a man he knew from the bodega gave him a call. The man asked Mr. Lopez Valdez to pick up a package in Camden and bring it to the bodega. He called several times and was insistent that Mr. Lopez Valdez pick up the package. He offered Mr. Lopez Valdez $150 to make the delivery. Mr. Lopez Valdez wanted to fit in at the bodega, and he did not want to offend the man, who at the time he considered a friend. The bodega was the only community he had in the United States, and he did not want to risk losing it. The man told Mr. Lopez Valdez to pick up the package at a gas station in Camden. Mr. Lopez Valdez did as instructed. He brought the package to the bodega, where he met up with the man and another person from the bodega he knew as "Azua." Azua, who is now his co-defendant, asked Mr. Lopez Valdez to walk down the block with him and deliver the package to someone waiting in a car. At Azua's instruction, he told the person in the car the package was "420" and "there would be more next week." Mr. Lopez Valdez and Azua were promptly arrested.

Mr. Lopez Valdez was shocked and terrified upon his arrest. He did not understand what had just happened. Nevertheless, he cooperated with the arresting officers by consenting to a search of his phone and of a second phone that had been given to him. On May 22, 2025, he admitted his guilt before this Court.

Prior to pleading guilty, Mr. Lopez Valdez spent ten months on pretrial supervision. He was fully compliant with his conditions of release. He lived with his cousin Luis and his family. He was on home incarceration, so he spent the time helping around the house, particularly with Luis's young kids. Mr. Lopez Valdez enjoyed playing soccer with the kids, who were three, five, and seven at the time. He also passed the time talking with his own children in London.

Mr. Lopez Valdez has now been at MDC since he pled guilty. He works five days per week in the kitchen packaging up food. He talks to his mother every week. He also calls his kids, who are anxious to know how long he will be incarcerated. Otherwise, he spends his time exercising in the yard and reading. He enjoys reading history and about the economy, but the options are limited as MDC has few books to begin with, and even fewer in Spanish. Still, he has made his way through books about World War II and the history of Spain.

**THE APPROPRIATE SENTENCE IS 60 MONTHS**

For a first-time, nonviolent offender like Mr. Lopez Valdez, a sentence of the mandatory minimum 60 months is "sufficient, but not greater than necessary, to comply with the purposes of" sentencing. 18 U.S.C. § 3553(a). That sentence is appropriate given the mitigating circumstances present here, most notably Mr. Lopez Valdez's minimal role in the offense and his forthcoming deportation.

### The § 3553(a) Factors Support a 60 Month Sentence

The **nature and circumstances of Mr. Lopez Valdez's offense** support a sentence of 60 months. It is undisputed that Mr. Lopez Valdez did not package or import the drugs himself. There is similarly no dispute that his offense did not involve a weapon or violence, and he did not play a leadership role in the offense. Instead, he delivered a package at the behest of people he met at the bodega. Though his desire to please his new friends does not excuse his conduct, it is nevertheless mitigating in assessing his role in the offense relative to these two other men.

The immigration consequences of Mr. Lopez Valdez's conviction also favor a 60-month sentence. Mr. Lopez will be deported following his imprisonment, a punishment in and of itself that must be factored into the Court's sentence. Deportation is "a particularly severe penalty," *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010), that is "the equivalent of banishment or exile," *Delgadillo v. Carmichael*, 332 U.S. 388, 390-91 (1947). It means that Mr. Lopez Valdez will, effectively, never be able to return to the United States. The uncertain job prospects that caused him to leave Spain in the first place await him when he finishes his time in prison.

Mr. Lopez Valdez's **history and characteristics** further militate in favor of a 60-month sentence. Mr. Lopez Valdez has never been in any legal trouble before the instant offense. Indeed, his cousin Luis told Probation he was "very surprised" when he heard about Mr. Lopez Valdez's arrest because he had "never heard anything negative about" Mr. Lopez Valdez until "he made this error." PSR ¶ 55. Similarly, his mother is "still grappling to understand this situation" because he never caused trouble growing up as "he has always been calm, hardworking, and respectful." **Exhibit B** (Letter from Santa Yuderca Valdez Ramirez). Though Mr. Lopez Valdez is already a Category I offender, the Sentencing Commission's decision to further reduce guideline sentencing recommendations for first time offenders ("zero-point offenders") like Mr. Lopez Valdez reflects the most current recidivism data showing that "offenders with zero criminal history points have considerably low recidivism

rates than other offenders, including offenders with one criminal history point." U.S. SENT'G COMM'N, *Amendments to the Sentencing Guidelines* 79 (Apr. 27, 2023).[2]

As Luis told Probation, Mr. Lopez Valdez is "family-oriented." PSR ¶ 55. Mr. Lopez Valdez's grandparents showed him what a loving, healthy, and stable family looks like, and he has modeled that behavior in his relationships with his mother and children. He "is attentive to his children" and "has always been at the center of [his] family." **Exhibits B and D** (Letters from Santa Yuderca Valdez Ramirez and Lissa Belen Lopez Valdez). He misses his family but takes solace in the regular communication he has with them. He thinks about the quality time he is missing, which weighs on him as he sits in a jail cell an ocean away.

Mr. Lopez Valdez is a hard worker. He got his first job at McDonald's when he was 17, working his way up to store manager. He is a former business owner, twice running his own remittance business. When his businesses went under, he quickly found work elsewhere. And he came to the U.S. in search of consistent employment. He found it here, getting a job as a delivery driver just weeks after moving. This "hardworking attitude inspired" his sisters "to work hard as well." **Exhibit C** (Letter of Yamirla Pamela Lopez Valdez). Now he works five days per week in the kitchen at MDC.

The goals of **respect for the law, deterrence, incapacitation, and rehabilitation** also support a sentence of 60 months. Mr. Lopez Valdez is remorseful for his conduct and understands the danger of his actions. He has demonstrated that remorse, and his respect for the law, by pleading guilty and faithfully abiding by his pretrial release conditions. Any prison sentence will be especially punitive as he is unlikely to receive in-person visits from his family, given that they all live outside of the United States. And Mr. Lopez Valdez's forthcoming deportation is an added measure of consequence to his arrest and conviction. A sentence of 60 months on top of that would be "sufficient, but not greater than necessary to" meet these sentencing goals. 18 U.S.C. § 3553(a).

Finally, a 60-month sentence would **avoid unwarranted sentencing disparities**. Courts in this District and the Eastern District of New York routinely sentence individuals convicted of violating 21 U.S.C. § 841(b)(1)(B) to the mandatory minimum 60 months under similar circumstances, including where the offense

---

[2] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (citing U.S. SENT'G COMM'N, Recidivism of Federal Offenders Released in 2010 (2021))

conduct involves opiates. *See, e.g.*, *United States v. Horton*, 24-cr-234 (JPO) (SDNY) (defendant arrested in possession of 80 capsules containing fentanyl, guidelines were 123-138 months, sentence was 60 months of imprisonment); *United States v. Erdogan*, 22-cr-33 (JSR) (SDNY) (defendant distributed 300 grams of mixture of heroin and fentanyl arrested in possession of 500 grams of same mixture, guidelines were 84-105 months, sentence was 60 months of imprisonment); *United States v. Rivera*, 21-cr-607 (AKH) (SDNY) (defendant arrested in possession of 5 kgs of cocaine, guidelines were 97-121 months, sentence was 60 months of imprisonment). Indeed, individuals often get time served when eligible under similar circumstances, even in opioid cases. *See, e.g.*, *United States v. Conkling*, 23-cr-32 (LDH) (EDNY) (26-year-old defendant distributed fentanyl and other drugs, guidelines were 30-37 months, sentenced to time served and three years of supervision); *United States v. Carmona Carmona*, 22-cr-434 (AT) (SDNY) (22-year-old defendant distributed 400 grams of fentanyl, guidelines were 57-71 months, sentenced to time served and one year of supervision); *United States v. McMaster*, 22-cr-672 (ALC) (SDNY) (39-year-old defendant distributed between 1.2-4 kg of fentanyl, guideline recommendation 46-57 months, sentenced to time served and three years of supervision), *United States v. Lavergne*, 22-cr-46 (CS) (SDNY) (31-year-old distributed 653 grams of fentanyl, sentencing guideline recommendation of 46-57 months, sentenced to time served and three years of supervision), *United States v. Rodriguez*, 22-cr-384 (PKC) (EDNY) (38-year-old defendant helped distribute 6 kg of fentanyl, guidelines 41-51 months, sentenced to time served and no supervision); *United States v. Pimental*, 21-cr-451 (JSR) (SDNY) (24-year-old defendant distributed 1.25 kg of fentanyl, guideline recommendation 70-87 months, sentenced to time served and two years of supervision), *United States v. Martinez*, 19-cr-681 (NRB) (SDNY) (32-year-old defendant distributed 2.3 kg of fentanyl, sentencing recommendation 46-57 months, sentenced to time served and three years of supervision). Considering the circumstances of this offense and Mr. Lopez Valdez's personal history and characteristics, a sentence of time served would be sufficient, reasonable, and in line with other sentences imposed in this District.

Respectfully submitted,

 /s/

Hannah McCrea
Assistant Federal Defender
Federal Defenders of New York

CC:    AUSA William Kinder

**EXHIBITS**

| | |
|---|---|
| A | Letter of Erik Lopez Valdez |
| B | Letter of Santa Yuderca Valdez Ramirez, Mr. Lopez Valdez's mother |
| C | Letter of Yarmila Pamela Lopez Valdez, Mr. Lopez Valdez's sister |
| D | Letter of Lissa Belen Lopez Valdez, Mr. Lopez Valdez's sister |
| E | Letter of Luis Jimenez, Mr. Lopez Valdez's cousin |



EXHIBIT A

August 13, 2025

Honorable Judge Ronnie Abrams,

My name is Erik Lopez Valdez, and I am 39 years old. I am deeply sorry and remorseful for the mistake I made. I have spent 2 months and 25 days at the MDC. I work in the kitchen serving breakfast, lunch, and dinner to all the inmates. My job helps me have a purpose and a goal every day. During this time, I have reflected on my life and learned to truly value my family and all the things I didn't give enough importance to before.

I feel ashamed and have a lot of remorse for my actions. I have caused shame and pain to my mother and my family. Even though they don't tell me, I know this case has affected them deeply. I made this mistake because I wanted to have friends in this country. When I came to the United States, I felt very lonely, as I was far from my life in Madrid. That's why I made this terrible decision. I deeply regret it. I came to this country to have better opportunities, to be able to help my children and give them everything they needed, not to make this mistake.

Honorable Judge Abrams, I ask for the opportunity to return to my family after serving my sentence. I had never been in trouble with the law before this case, and I will never make the same mistake again.

Thank you,

Erik Lopez Valdez[1]

---

[1] This letter has been translated from Spanish.



# EXHIBIT B

Madrid, Spain

August 7, 2025

Honorable Judge Ronnie Abrams:

My name is Santa Yuderca, and I am the mother of Erik Lopez Valdez. I am writing this letter to share more about the incredible person my son is. I sent Erik and his sisters to live with my mother in Santo Domingo when he was about 4 years old. This was a hard sacrifice to make so that I could work in Spain, since I couldn't provide for my family by staying in the Dominican Republic. I worked various jobs as a waitress and caring for older people and sent all my earnings to my mother for food, medicine, and anything else they needed. I visited them as much as I could and worried about them all the time. It wasn't until Erik was 15 years old that we were reunited as a family in Spain.

When we reunited, we became inseparable. He never gave my mother any problems as a child nor me as a teen. That's why I am still grappling to understand this situation. He has always been calm, hardworking, and respectful. Ever since he could work, he has helped our family. If we needed food, he'd buy it for us with the money he earned at McDonald's or at any of the other jobs he had. Erik has always been at the center of our family. He has always been there for his sisters, his grandmother, and me. He loves his family and is kind and generous to everyone.

My son has two children in college. He wishes to be able to be with them during this important stage of their lives. He has always been a present and committed father, and I know how much it would mean to him to continue guiding and supporting his children as they prepare for the future. He moved to the United States to further help his children. The salaries in this country are too low, and the cost of living is too high.

This case has been very painful for all of us, but especially for him. I know he is painfully remorseful for his actions, and I am certain that he has learned a very hard lesson. Each time we talk, he tells me that he is very sorry. He wants to correct his path in life and continue working to support his children.

I know my son is more than the mistake he has made. He is an incredible person who deserves the chance to come home. I sincerely ask you to give him the chance to return to his family.

With respect and hope,

Santa Yuderca Valdez Ramirez[1]

---

[1] This letter has been translated from Spanish.



# EXHIBIT C

8/15/25

Judge Ronnie Abrams,

I am one of Erik Lopez Valdez's younger sisters. We were raised by my grandmother for the first 12 years of my life in the Dominican Republic. My mother had moved to Spain to give us a better quality of life. When she was able to bring us with her to Madrid, Erik finished high school and began working. He became a huge part of providing for our household. He supported our mother with rent, food, and other necessities. He was always a hard worker and never complained about having to work. His hardworking attitude inspired me and my sister to work hard as well.

My brother lives his life for his children. Even though he is separated from their mother, he always takes care and provides for them. When his youngest son, who has suffered from diabetes since he was 4 years old, goes through a tough period, Erik travels to London to take care of him. I have known my brother my whole life, and he has never had any conflicts with the law. He is deeply sorry for what he did. This has been a devastating event for our family and being so far away from him makes it harder to process. I believe my brother deserves the opportunity to correct his mistake and return to working hard for himself and his children.

Thank you.

Yamirla Pamela Lopez Valdez[1]

---

[1] This letter has been translated from Spanish.

# EXHIBIT D

Honorable Judge Ronnie Abrams,

My name is Lissa Belen Lopez Valdez. I am the younger sister of Erik Lopez Valdez. My brother is a beautiful person, father, and brother. He made a mistake, not out of malice, but to be friends with people he thought he could trust. I never expected this from him, and I'm very disappointed.

When I was little, Erik used to take me to the park, and if I needed something for school, he bought it with his own money. If I wanted to go somewhere or if I needed money for school, he gave it to me. My brother worked at McDonald's and later at call centers. He has always worked to support our family. We didn't live with our father; we just grew up with our mother working and taking care of us. Later, my brother was the first of us to start working. My favorite memories with him are of when we used to walk down the street and he'd point out the model of each car we passed. He has always loved cars.

Erik is an excellent father. He is attentive to his children, and they adore him. He has always been present in their lives. For example, although his children live with their mother in London, they talk often, he visits them, and he helps them as much as he can. At the of the case, I would like my brother to learn from this and move on with his life. I ask that you please give him a chance.

Thank you for reading my letter.[1]

---

[1] This letter has been translated from Spanish.

# EXHIBIT E

08/19/25

Judge Abrams,

My name is Luis Jimenez, and I'm Erik Lopez's cousin. Erik lived with me for a couple of months when he moved to the United States and again during his time in home detention. When he arrived in this country, he worked doing deliveries for Amazon Flex and Gomo, an online application. He used his money to support me at home so that I could have food, water, and electricity for my family. He also took my children to school every morning, and when I went out to run errands, he watched my kids at home. My kids love their uncle very much.

When he was in home detention, he was very sad and disappointed in himself because he couldn't help me financially. But I always told him not to worry because he was still helping me take care of my kids at home. Erik is a wonderful person. Each time he calls me from jail, each Thursday and Sunday, he tells me how remorseful he is. He knows he made the biggest mistake of his life. He's always been a hard-working person, without any problems. He just let himself be influenced by people he shouldn't have.

I've talked to him a lot while he's been in prison. He tells me about his goals: starting a business, living off a farm, and being able to sustain his kids who are in college in London. He wants desperately to move forward with his life for his family.

Thank you.[1]

---

[1] This letter has been translated from Spanish.