

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 29, 2025

**BY ECF**
The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    *United States v. Erik Lopez Valdez*, 24 Cr. 458 (RA)

Dear Judge Abrams:

    The Government respectfully submits this letter in advance of the sentencing of defendant Erik Lopez Valdez, scheduled for September 5, 2025 at 12:00 p.m. On May 22, 2025, the Court accepted Lopez Valdez's guilty plea to Count One of the Indictment, which charged Lopez Valdez with conspiracy to distribute fentanyl in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B).[1] For the reasons set forth below, the Government submits that a Guidelines sentence of 60-71 months' imprisonment is appropriate in this case.

### I. FACTUAL BACKGROUND

    **A. Offense Conduct**

    On April 15, 2024, Lopez Valdez's co-defendant, Miguel De Jesus Reyes Medina, arranged to sell 500 grams of fentanyl to an individual whom, unbeknownst to Reyes Medina and Lopez Valdez, was a confidential source working at the direction of the law enforcement ("CS-1"). (Presentence Investigation Report ("PSR") ¶ 12). The following afternoon, CS-1 traveled by car to Manhattan to acquire the fentanyl, where he was told by Reyes Medina that the courier responsible for bringing the package of drugs—Lopez Valdez—was late. (*Id.*).

---

[1] Count One charged the defendant with conspiracy to distribute and possess with intent to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), which carries a 10-year mandatory minimum. However, under the terms of the parties' plea agreement, Lopez Valdez pleaded to the lesser included offense of participating in a conspiracy to distribute and possess with intent to distribute 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B), which carries a mandatory minimum of five years.

Eventually, at about 8:00 p.m., in the vicinity of 344 Fort Washington Avenue, Lopez Valdez arrived and entered CS-1's vehicle. (*Id.*). Lopez Valdez then handed CS-1 a package of drugs. (PSR ¶ 13). CS-1 asked Lopez Valdez to confirm the amount of drugs contained in the package. (*Id.*). Lopez Valdez responded that it was 420 grams. (*Id.*). When CS-1 explained that his deal with Reyes Medina was for 500 grams, not 420 grams, Lopez Valdez disagreed, and told CS-1 that more drugs would be available the following week. (*Id.*). The interactions between CS-1, Lopez Valdez, and Reyes Medina were recorded and observed by law enforcement agents, and once CS-1 notified the agents of the presence of narcotics, they executed the arrests of both defendants. (PSR ¶ 14). Incident to arrest, law enforcement agents recovered a cellphone and a small plastic bag of fentanyl from Lopez Valdez's person. (*Id.*). The April 16, 2024 drug transaction followed an initial purchase by CS-1 of a sample of fentanyl from Reyes Medina, on April 10, 2024.

Subsequent laboratory testing revealed that the narcotics package purchased by CS-1 on April 10, 2024 contained approximately 72 grams of a substance containing both fentanyl and protonitazene, which is a synthetic opioid up to three times more potent than fentanyl. The package purchased by CS-1 from Lopez Valdez on April 16, 2024 contained protonitazene but not fentanyl. The small bag of narcotics obtained from Lopez Valdez's person following his arrest on April 16, 2024 contained 1.4 grams of fentanyl.

### B. Procedural History

Lopez Valdez was charged by complaint and presented before United States Magistrate Judge Robert W. Lehrburger on July 15, 2024, and was released on conditions. On July 31, 2024, a grand jury sitting in this District returned a three-count Indictment. Lopez Valdez was charged in two of those counts. Count One charged both Lopez Valdez and Reyes Medina with conspiracy to distribute 400 grams and more of fentanyl in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). Count Three charged both Lopez Valdez and Reyes Medina with a substantive count of distribution and possession with intent to distribute protonitazene, for the April 16, 2024 drug transaction, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).[2]

On May 22, 2025, Lopez Valdez waived indictment and entered a plea of guilty to the lesser included offense for Count One, of conspiracy to distribute 40 grams and more of fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B). The Court remanded Lopez Valdez following the plea conference.

Lopez Valdez's guilty plea was entered pursuant to a plea agreement. In the plea agreement, the parties stipulated that the defendant's Guidelines range is 60 to 71 months' imprisonment, with a mandatory minimum sentence of 60 months' imprisonment.[3] With an

---

[2] Count Two charged only Reyes Medina with a substantive count of distribution and possession with intent to distribute fentanyl and protonitazene, for the April 10, 2024 drug transaction, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).

[3] Although Lopez Valdez appeared to otherwise be safety-valve eligible, he chose not to participate in a safety-valve proffer with the Government. As the parties have agreed in the plea agreement,

offense level of 25 and a criminal history category of I, Lopez Valdez's Guidelines range would be 57-71 months' imprisonment; because of the application of the mandatory minimum, however, it is 60-71 months.

On August 11, 2025, the Probation Office filed the PSR, which also calculates a Guidelines range of 60-71 months' imprisonment. The Probation Office recommends a sentence of 60 months' imprisonment, to be followed by four years of supervised release. Lopez Valdez requests a sentence of 60 months' imprisonment.

## II. Discussion

### A. Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in

---

he has therefore not satisfied the conditions set forth in 18 U.S.C. § 3553(f) to obtain safety-valve relief.

the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B. The Court Should Impose a Guidelines Sentence

The Government respectfully submits that a Guidelines sentence of 60-71 months' imprisonment is sufficient, but not greater than necessary, to accomplish the purposes of sentencing in this case.

*First*, a substantial sentence of imprisonment is necessary to reflect the seriousness of the offense and provide just punishment. As the Court is aware, trafficking in mixtures of fentanyl is a lethal crime. According to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[4] In 2023, for the first time in U.S. history, the overdose death rate topped 112,000 in a 12-month period, according to the CDC, with young people and people of color among the hardest hit.[5] Drug policy experts and people living with addiction say the magnitude of this epidemic has eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[6] The fentanyl crisis continues to devastate communities across the country, resulting in another 87,000 deaths in 2024.[7]

And in fact, the narcotics that Lopez Valdez handed to CS-1 contained protonitazene, a novel synthetic opioid *even more dangerous then fentanyl*. Nitazenes are a class of emerging, non-

---

[4] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; (last accessed March 20, 2025); *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can "wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[5] https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction#:~:text=In%2 02023%20the%20overdose%20death,for%20Disease%20Control%20and%20Prevention (last accessed March 20, 2025).

[6] *Id.*

[7] https://www.npr.org/2025/03/07/nx-s1-5295618/fentanyl-overdose-drugs (last accessed March 20, 2025).

fentanyl synthetic opioids with a potency of up to 20 times greater than fentanyl.[8]  Seven nitazenes are Schedule I controlled substances, with five of those, including protonitazene, having been added between 2021 and 2024 due to the sudden increase in their sales and use.  *Id.*  Protonitazene, in particular, is estimated to be approximately three times more potent than fentanyl.[9]

As the Wall Street Journal recently reported, nitazenes began appearing in drug seizures in the U.S. and Europe in 2019, as drug dealers realized they could purchase nitazenes cheaply from international suppliers, and mix them with bulking agents such as caffeine (as was the case here), to strengthen the effects of their drugs.  *See* Ex. A at 4, *Stronger Than Fentanyl: A Drug You've Never Heard of is Killing Hundreds Every Year*, Wall Street Journal, July 29, 2025.  But just a *single milligram* of protonitazene is a potentially fatal dose.  *Id.* at 2.  The highly potent nature of nitazenes has caused hundreds of recent deaths Europe, leading the United Kingdom's National Crime Agency to warn that "there has never been a more dangerous time to take drugs."  *Id.*; *see also id.* at 2 ("'This is probably the biggest public health crisis for people who use drugs in the U.K. since the AIDS crisis in the 1980s,' said Vicki Markiewicz, executive director for Change Grow Live, a leading treatment provider for drugs and alcohol in the U.K.").  This same crisis is now emerging here in the United States, as nitazenes have been detected in thousands of U.S. drug seizures since 2019, and have caused at least dozens of deaths.  *Id.*[10]

Lopez Valdez was not an unwitting participant in his exceptionally dangerous crime.  He knew of the danger his conduct posed, as the phone seized at his arrest showed that he had executed google searches for "fentanilo effectos" ("fentanyl effects") and "forma de hace fentanilo" ("how fentanyl is made") prior to the April 16, 2024 transaction.  And yet he proceeded to participate in the crime anyway.  The defendant tried to make easy money by agreeing to peddle a substance he knew to be a highly addictive and dangerous, which for years has caused devastating illness and death, funded violent criminal organizations, and destabilized American communities.  The Court's sentence should reflect the severity of such conduct.

---

[8] *See* Verbeek J. and Brinkman D., "A Comprehensive Narrative Review of Protonitazene," *Basic & Clinical Pharmacology & Toxicology*, June 25, 2025, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC12239055/pdf/BCPT-137-0.pdf.

[9] *See* Center for Forensic Science Research & Education, "New Synthetic Opioid Protonitazene Increasing in Prevalence as 'Nitazenes' Gain Traction Across the United States and Canada," December 10, 2021, available at: https://www.cfsre.org/nps-discovery/public-alerts/new-synthetic-opioid-protonitazene-increasing-in-prevalence-as-nitazenes-gain-traction-across-the-united-states-and-canada.

[10] *See also Surging Opioid Nitazene Could Be Deadlier than Fentanyl, Experts Warn*, New York Post, August 29, 2023, available at https://nypost.com/2023/08/29/surging-opioid-nitazene-could-be-deadlier-than-fentanyl-experts-warn/; *On the Streets, Opioids Sometimes More Potent than Fentanyl*, Washington Post, December 10, 2023, available at https://www.washingtonpost.com/health/2023/12/10/nitazenes-opioid-stronger-than-fentanyl/.

*Second*, a substantial sentence of imprisonment is necessary for deterrence and to protect the public. General deterrence is of particular importance in this case, given the emerging threat of nitazenes in the U.S. street drug supply. This is one of the first prosecutions in the country involving distribution of a nitazene. The Court thus has a unique opportunity to impose a sentence that will send the message, at the outset of an emerging public health crisis, that nitazene drug offenses will simply not be tolerated. The guidance that the Court should provide to the public and would-be drug dealers is that selling nitazene-laced narcotics is even more reprehensible than selling fentanyl, and that those who are caught will be sentenced accordingly.

A significant sentence will also serve the goals of specific deterrence and promoting respect for the law. Lopez Valdez's drug trafficking was not a momentary lapse in judgment. His internet search history demonstrates that his decision to distribute lethal drugs was informed and deliberate. In proceeding to engage in the crime anyway, Lopez Valdez thus exhibited a disregard for the health and safety of others, and for the laws of this country. Lopez Valdez's conduct thus warrants a serious sentence that will deter him from engaging in such offenses again, and promote his respect for the rule of law.

\* \* \*

In recommending a Guidelines sentence, the Government has considered the mitigating circumstances presented in the PSR and Lopez Valdez's sentencing submission, including his lack of criminal history, his family circumstances, and his role in the offense. The Government notes that it views Lopez Valdez as less culpable than Reyes Medina, who negotiated and arranged the drug transactions with CS-1. While the Court can and should take these facts into account, however, they do not change the severity of Lopez Valdez's criminal conduct. At bottom, he knowingly peddled an extremely lethal substance, without regard to the harm that synthetic opioids inflict upon others. A substantial sentence of imprisonment is necessary to reflect the seriousness of this crime.

### III. Conclusion

For the reasons set forth above, the Government submits that a Guidelines sentence is appropriate in this case.

Respectfully submitted,
JAY CLAYTON
United States Attorney

By: _____
William C. Kinder
Assistant United States Attorney
(212) 637-2394

Cc: Counsel of Record (by ECF)

# Exhibit A

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/nitazenes-opioid-drug-crisis-ded1a3b9

# Stronger Than Fentanyl: A Drug You've Never Heard of Is Killing Hundreds Every Year

Ultrapotent nitazenes, mostly from China, are easy to smuggle and mix into heroin, recreational drugs and gray-market pharmaceuticals

By *Sune Engel Rasmussen* [Follow] and *Ming Li* [Follow] | *Photographs by Mary Turner for WSJ*

July 29, 2025 11:00 pm ET

≡   Quick Summary                                                                                ⌄

- The use of ultrapotent synthetic opioids called nitazenes are spreading in Europe.

**View more**

LONDON—Fentanyl fueled the worst drug crisis the West has ever seen. Now, an even more dangerous drug is wreaking havoc faster than authorities can keep up.

The looming danger is an emerging wave of highly potent synthetic opioids called nitazenes, which often pack a far stronger punch than fentanyl. Nitazenes have already killed hundreds of people in Europe and left law enforcement and scientists scrambling to detect them in the drug supply and curb their spread.

The opioids, most of which originate in China, are so strong that even trace amounts can trigger a fatal overdose. They have been found mixed into heroin and recreational drugs, counterfeit painkillers and antianxiety medication. Their enormous risk is only dawning on authorities.

**Relative potency of common opioids**

Morphine: 200 mg

Fentanyl: 2 mg
(potentially fatal dose)

Heroin: 100 mg

Equals the size of a pencil eraser

Protonitazenes: 1 mg

Isotonitazenes: 0.4 mg

Note: The depicted amounts are based on the potency of the various opioids relative to fentanyl. The exact amount that will cause an overdose depends on a variety of factors.
Source: The American Chemical Society

Europe, which has skirted the kind of opioid pandemic plaguing the U.S., is now on the front line as nitazenes push into big heroin and opioid markets such as Britain and the Baltic states. At least 400 people died in the U.K. from overdoses involving nitazenes over 18 months until January of this year, according to the government.

"This is probably the biggest public health crisis for people who use drugs in the U.K. since the AIDS crisis in the 1980s," said Vicki Markiewicz, executive director for Change Grow Live, a leading treatment provider for drugs and alcohol in the U.K. Particularly worrying, she said, is that most people take nitazenes unwittingly, as contaminants in other drugs.

The U.K.'s National Crime Agency has warned that partly due to nitazenes, "there has never been a more dangerous time to take drugs."

In the U.S., where fentanyl dominated the opioid market, nitazenes had as of last year been found in at least 4,300 drug seizures since 2019, usually in fentanyl mixtures, and have led to dozens of deaths. But reporting on the drugs is sparse and relies on self-reporting. Many overdose toxicology tests don't include nitazenes. The Drug Enforcement Administration has warned that Mexican cartels could use their existing relations with China-based suppliers to obtain nitazenes and funnel them into America.

The most common street nitazenes are roughly 50 to 250 times as potent as heroin, or up to five times the strength of fentanyl. They are likely much more prevalent than official statistics suggest, due to limited testing. Authorities say official death tolls are almost certainly undercounts.

On an early summer morning in 2023, police arrived at Anne Jacques's door in north Wales. Her 23-year-old son had died in his sleep in his student apartment in London, they told her.

Her son, Alex Harpum, was a rising opera singer and healthy. Police found Xanax tablets in his room, and evidence on his phone that he had bought pills illegally, which Jacques said he occasionally did to sleep while on medication for his attention-deficit hyperactivity disorder.

Yet, the coroner established the cause of death as unexplained cardiac arrest, known as sudden adult death syndrome. Jacques, not satisfied with the explanation, researched drug contaminants and requested the coroner test for nitazenes. Seven months after her son's death, police confirmed that his tablets had been contaminated with the potent opioid.

"I basically had to investigate my own son's death," Jacques said. "You feel like your child has been murdered."

Harpum wasn't alone. While most known overdoses affect heroin users, nitazenes have also been found in party drugs like cocaine, ketamine and ecstasy, in illegal nasal sprays and vapes, and detected in benzodiazepines like Xanax and Valium. In May, two young Londoners died after taking what authorities believe was oxycodone laced with nitazenes upon returning home from a nightclub.



'I basically had to investigate my own son's death,' says Anne Jacques.

Dealers aren't trying to kill customers, but the globalized drug trade leads gangs to traffic a wider variety of increasingly potent substances, partly because smuggling gets easier as the volumes involved shrink.

U.K. National Crime Agency Deputy Director Charles Yates said dealers are driven mainly by greed. "They buy potent nitazenes cheaply and mix them with bulking agents such as caffeine and paracetamol to strengthen the product being sold and make significant profits," he said.

Nitazenes are also ravaging West Africa as a prevalent ingredient in kush, a synthetic drug that has killed thousands of people and led Sierra Leone and Liberia to declare national emergencies.

"It's an international concern. They have been detected on every continent," said Adam Holland, an expert on synthetic opioids at the University of Bristol. "You can produce them with different chemicals that are relatively easy to get a hold of, and you can do it in an underground laboratory. And because they're so potent, you need less for the same size of market so they're easier to smuggle."

Chinese suppliers sell nitazenes openly on online marketplaces sometimes using photos of young women as their profile picture. They list phone numbers, social-media handles and business addresses linked to China or Hong Kong. The drugs are sometimes labeled as research chemicals but also often explicitly as nitazenes.

The Wall Street Journal found nearly 100 profiles on the Pakistan-based web marketplace TradeKey selling different types of nitazenes, including etonitazenes, estimated to have 15 times the potency of fentanyl. Four suppliers told a Journal reporter they could send any quantity to Europe, including the U.K., and promised they could evade customs.

**WSJ reporter**

Hello, can you send nitazenes to Europe?

**Nitazenes seller in China**

Hello friend yes how much do you need?

To the UK as well? Can you clear customs?

Yes, we can ship to the UK. We offer door-to-door delivery with double customs clearance and tax included

What is the max quantity you can send?

It depends on your needs. We use disguised packaging, which is very safe. Large quantities can be shipped.

Kilos?

Yes



I am a reporter with The Wall Street Journal and I reached out to you because I am writing a

story about nitazenes. Would you mind if I ask
you a few additional questions?

Ok

Nitazenes are a highly potent and dangerous
type of opioid. It has killed hundreds of people
in Europe. Do you have any reservations about
selling these drugs, given how dangerous they
are?

We are a legitimate manufacturer and only work with licensed pharmaceutical companies. The dangers you mentioned are the result of misuse and abuse by individuals, not the product itself.

This question shouldn't be directed at me. You should be asking how your own country is managing this issue. Why can't your country control the misuse of drugs?

A spokesperson for TradeKey said the company has a "zero-tolerance policy toward the listing or sale of any controlled substances, including synthetic opioids such as nitazenes." It said it had added various types of nitazenes to its banned products registry and blocked hundreds of accounts seen to violate its compliance rules. On "rare occasions," a prohibited product may pass initial approvals and get listed, but the company worked to routinely clean the site, it said.

"We take this issue very seriously and are fully committed to ensuring our platform is not misused in any way. We also cooperate with regulatory and law enforcement bodies as needed," the spokesperson said.

Nitazenes were never approved for medical use in Europe. Developed in the 1950s, they were found in trials to cause fatal breathing problems. They were detected sporadically over the years: in a lab in Germany in 1987; in 1998 in Moscow, where they were linked to a dozen deaths; and in 2003 in Utah, where a chemist manufactured them apparently for personal use.

Nitazenes appeared in drug seizures in Europe and the U.S. beginning in 2019, and began spreading quickly in Europe in 2023, their high potency leaving a trail of fatal overdoses even among seasoned drug users. In Scotland, whose population of 5.5 million has the highest overdose death rate per capita in Europe, nitazenes have been involved in 150 to 200 drug-related deaths in the past two years alone, said Austin Smith, head of policy with the Scottish Drug Forum charity.

"Imagine mixing salt in sand on a beach, it's impossible to do that evenly," he said.

Europe's medical practices have protected it from fentanyl, which first took off in the U.S. in the 1990s due to private prescriptions and aggressive marketing. However, Europe is vulnerable to opioids in ways that echo the American experience. The second big boost in fentanyl usage in the U.S. came in the 2010s, when drug cartels began adulterating the heroin supply with fentanyl.



New types of opioids reported in Europe

Source: European Union Drugs Agency

So far, nitazenes appear to be supplied by individual brokers and sellers, but Europe is rife with international drug gangs that could turn to nitazenes.

"Synthetic opioids in the U.S. have not been driven by demand, they have been driven wholesale by supply," said Vanda Felbab-Brown, senior fellow and expert on the global opioid trade with the Brookings Institution, a think tank. "If large criminal groups such as Albanian mafia groups, Turkish criminal groups or Italian or Mexican groups get into supplying nitazenes to Europe on a large scale, we can anticipate a massive public healthcare catastrophe."

They may be prompted to do so. Since the Afghan Taliban most recently banned in 2022 the cultivation of poppies, which supplied about 90% of the world's heroin, experts have warned that a heroin shortage could lead gangs to cut the drug with other, more dangerous substances. Nitazenes are at the top of the list.

"If the heroin supply is interrupted, that will have a knock-on effect on drug use within Europe, and on things users can turn to in the absence of heroin, such as synthetic opioids and synthetic crystal meth," said Andrew Cunningham, expert on drug markets with the European Union Drugs Agency.




Photos of Alex Harpum as a child and a clay plane he once made at his mother's home.

The tiny nation of Estonia has firsthand experience of what that is like. When the Taliban first banned poppy cultivation in 2000, fentanyl flooded the Estonian drug market as a replacement for heroin. Drug-related deaths grew fourfold in two years, and put the Baltic country in a fentanyl grip that it was unable to shake. For a decade, from 2007 to 2017, Estonia had the highest per capita overdose death rate in Europe. And Estonia is already feeling the influx of nitazenes, which since 2023 have been involved in nearly half of all drug-induced deaths in the tiny Baltic nation.



**Nitazene-linked deaths by country**

Sources: U.K. government; Estonia's National Institute for Health Development; European Union Drugs Agency (Latvia)

When a batch of drugs contaminated with nitazenes hits the streets, it often results in a cluster of overdoses. Late last year, about 80 people overdosed and needed medical treatment in Dublin over a weekend. In March of this year, at least 31 users overdosed over a few days in Camden, north London.

One of them, Tina Harris, 41, who has been using heroin since her early teens, said she bought a £5 bag of what she thought was fentanyl from a drug dealer in Camden.

"He told me, 'be careful because it's strong.' I thought he was just chatting sh—," she said. After smoking the drug, she passed out, and survived only because a friend administered shots of naloxone, an antidote that users carry for emergencies, until the ambulance arrived.

Harris woke up in the hospital, rattling from withdrawal. Since then, she has twice saved the life of friends who mistakenly took nitazenes, by providing naloxone and CPR. She has become increasingly worried about the drug supply in London, but said her addiction is impossible to kick.

"It's a devil's trap," she said.

Write to Sune Engel Rasmussen at sune.rasmussen@wsj.com and Ming Li at ming.li@wsj.com

*Appeared in the July 30, 2025, print edition as 'A Drug You Haven't Heard Of Is Killing Hundreds Every Year'.*